## THE STATE v. GEORGE FENTON, Appellant.

### Division Two, March 12, 1913.

1. **INSANITY: Conflict in Testimony: Matter for Jury.** The issue of insanity of a defendant charged with the murder of his wife, where there is substantial evidence tending to prove he was insane and other substantial evidence tending to establish his sanity, at the time he killed her, is properly submitted to the jury, and with their verdict on that issue the appellate court cannot interfere.

2. **REMARKS OF PROSECUTING ATTORNEY: Reference to Independent Crimes.** In a prosecution for the murder of a wife, where the defense was insanity, the prosecuting attorney said to the jury: "Recall that celebrated case in New York City a few years ago, where the defense was insanity. Recall

that case in St. Louis, too, where a man shot his wife and child under similar circumstances." Defendant's counsel objected that the remarks had reference to independent crimes, and on the prosecuting attorney's rejoinder that he had not called any names the court told him to confine himself to the record. Thereupon the prosecuting attorney said: "I beg pardon of the court and the jury, and the counsel, as well." *Held*, that if the jury understood to what cases the prosecuting attorney referred, it must be presumed that, being sensible men, they also understood from the court's admonition and the prosecutor's apology that they should not consider the results or facts in any other case in arriving at their verdict, and the remarks, therefore, were not reversible error.

3. ————: **Illogical Testimony.** The prosecuting attorney, in his argument to the jury, has a right to ridicule the testimony of an insanity expert as illogical.

4. ————: **Charge That Defendant Had Been Coached.** An admission by the prosecuting attorney, in his argument to the jury, in a murder trial where the defense is insanity, that defendant had acted during the trial as if he did not comprehend what was going on, was an admission favorable to defendant; and an insinuation, immediately following that admission, that defendant might have been drilled or coached to act that way by his eminent expert witnesses and his eminent counsel, was simply a weak argument based on a mere conjecture, and could not have misled the jury or inflamed their minds against defendant, and was not reversible error, though the remarks are not approved.

Appeal from Boone Circuit Court.—*Hon. David H. Harris*, Judge.

AFFIRMED.

*Harris & Finley* and *P. H. Cullen* for appellant.

(1) The court erred in permitting the prosecuting attorney to make improper and prejudicial statements in his closing argument to the jury. (a) It was the duty of the court to keep the prosecuting attorney within the bounds of legitimate argument and to administer to him such rebuke as was commensurate with the harm done. Evans v. Trenton, 112 Mo. 395; State v. Spivey, 191 Mo. 112. (b) The prosecuting attorney's reference to other cases was altogether out-

side of the record, was an attempt to discredit insanity as a defense, and was calculated only to prejudice the jury against the defendant. State v. Lee, 66 Mo. 165; State v. Jackson, 95 Mo. 652; State v. Woolard, 111 Mo. 255; State v. Hyde, 234 Mo. 256. (c) The remarks charged the defendant's attorneys and the alienists with having trumped up the defense of insanity and constitute reversible error. State v. Clapper, 203 Mo. 552; State v. King, 174 Mo. 659; State v. McMullin, 170 Mo. 632. (d) The reference to the appearance and demeanor of the defendant was highly improper, for which alone the judgment should be reversed. Perez v. Ter., 94 Pac. (Ariz.) 1097; State v. Bokien, 44 Pac. (Wash.) 889; Besette v. State, 101 Ind. 85. (e) The error resulting from the prejudicial remarks of the prosecuting attorney was not cured by the admonition of the court to "keep within the record," nor by the fact that the prosecutor said "I beg pardon" when interrupted by defendant's counsel. State v. Ferguson, 152 Mo. 99; State v. Upton, 130 Mo. App. 320; State v. Bobbst, 131 Mo. 339; State v. McGrath, 228 Mo. 429; State v. Deitz, 235 Mo. 341. (2) The verdict is against the weight of the evidence and is the result of passion and prejudice on the part of the jury. (a) The evidence on the part of the defendant was from witnesses who, by reason of their acquaintance and relationship to defendant, were most competent to judge of his sanity or insanity. Knapp v. Trust Co., 199 Mo. 665; Holton v. Cochran, 208 Mo. 417. (b) Under all the facts and circumstances the verdict is against the evidence and must have been the result of passion and prejudice on the part of the jury. State v. Speyer, 207 Mo. 540; 194 Mo. 459, 182 Mo. 77.

*Elliott W. Major*, Attorney-General, and *Alex. Z. Patterson*, Assistant Attorney-General, for the State.

(1) It is within the range of legitimate argu-

ment for counsel to discuss all inferences which may be drawn from the evidence and to impress them upon the jury.    State v. Johns, 124 Mo. 379; State v. Musick, 101 Mo. 260; State v. Mallon, 75 Mo. 355; Lide v. State, 133 Ala. 43; People v. Phelan, 123 Cal. 551; Milan v. State, 108 Ga. 29; Comm. v. Barrows, 176 Mass. 17; People v. Doody, 172 N. Y. 165.    (2)   That the inferences of counsel are illogical and erroneous neither calls for the court's interference nor warrants a new trial.    Scott v. State, 110 Ala. 48; People v. Amaya, 134 Cal. 531; Sterling v. State, 89 Ga. 807; Sage v. State, 127 Ind. 15; Davis v. State, 15 Tex. App. 594; U. S. v. Flowery, 25 Fed. Cas. No. 15,122; 1 Sprague 109.    (3)   The jury is not bound by the inferences and may reject them.   Hence there can be no harm in the court disregarding them.    Mitchell v. State, 43 Fla. 584; State v. Toombs, 79 Iowa, 741.    (4) Matters of common and general public notoriety may be properly commented on and refered to by way of argument or illustration.    State v. Punshon, 133 Mo. 44; People v. Bartheman, 120 Cal. 7; Combs v. State, 75 Ind. 215; Turner v. State, 89 Tenn. 547.    (5)   The conduct of the accused and his counsel during the trial may be commented on without error.    Inman v. State, 72 Ga. 269; Norris v. State, 64 S. W. (Tex.) 1044; Thompson v. State, 44 S. W. (Tex.) 837.    (6)   Interfering with counsel in his argument is discretionary with the court, and the appellate court will not review such discretion unless it appears that the rights of the prisoner were actually prejudiced.    State v. Hamilton, 55 Mo. 520; State v. Allen, 45 W. Va. 65; Inman v. State, 72 Ga. 269; Combs v. State, 75 Ind. 215; Ford v. State, 34 Ark. 649; State v. Turner, 36 S. C. 534. (7)   The right of counsel in argument to embellish their arguments with illustrations is not governed by any fixed rule, but is controlled by the discretion of the court, and unless such discretion is palpably abused in such a way as to manifestly tend to an im-

proper conviction the exercise of such discretion will not be controlled by the appellate court. Bulliner v. People, 95 Ill. 396; Seibert v. People, 143 Ill. 571; Todd v. State, 44 S. W. (Tex.) 1096. (8) Courts are loath to reverse judgments on account of improper remarks of attorneys—especially as in this case, where the proof is clear, because in such cases a verdict of guilty would have been returned regardless of the improper remarks. State v. Dietz, 235 Mo. 332; State v. Harvey, 214 Mo. 403; State v. Church, 199 Mo. 605; State v. Hibler, 149 Mo. 478; State v. Summar, 143 Mo. 220; State v. Dusenberry, 112 Mo. 277; Sec. 5115, R. S. 1909. (9) The remark of the prosecuting attorney, first objected to, in which he refers to the celebrated cases in New York and St. Louis in which the defense was insanity, was surely regarding matters of common and public notoriety and proper to discuss. To state that in certain celebrated cases the defense was insanity was but stating that which every one knows and could not have prejudiced the jury. State v. Punshon, 133 Mo. 59; Northington v. State, 14 Lea, 424; Combs v. State, 75 Ind. 219. (10) Insinuating remarks made against the counsel for the accused furnish no ground for reversal, where the court told the prosecuting attorney that his remarks were out of order. State v. Taylor, 134 Mo. 109. (11) Since the conduct of accused might properly be commented on by the prosecuting attorney, it was not error for the prosecuting attorney to state that appellant had sat at the trial apparently not comprehending anything that had occurred. The attitude and conduct of appellant were matters for the jury to consider, and even though the prosecuting attorney drew an erroneous conclusion and inference from such attitude and conduct, yet the statement of such mistaken inferences and conclusions do not constitute such misconduct as will warrant a reversal. State v. Mallon, 75 Mo. 355; Behler v. State, 112 Ind. 140; People v. Bankhart, 59 Cal.

402; People v. Lee, 60 Cal. 95; Spahn v. People, 137 Ill. 538; Sage v. State, 127 Ind. 15; Ross v. State, 57 Pac. (Wyo.) 924. And this, for the reason that counsel do not always agree as to what the testimony is. People v. Barnhart, 59 Cal. 402. (12) As a general rule, the withdrawal of the objectionable remarks of the prosecuting attorney, either by himself or by the court, or a direction to disregard them, is deemed to have removed the prejudice and cured the error. State v. Gartrell, 171 Mo. 489; State v. McMullins, 170 Mo. 608; State v. Wright, 141 Mo. 333; State v. Hack, 118 Mo. 92; State v. Gibbs, 10 Mont. 213; Dunlap v. U. S., 165 U. S. 486; People v. Benham, 160 N. Y. 402.

BROWN, P. J.—Convicted of murder in the first degree, defendant appeals from a judgment of the circuit court of Boone county fixing his punishment in the penitentiary for the term of his natural life.

Defendant, a widower, age forty-four, with six children, was married to Salina Florence Jordan, a widow, on December 7, 1910. They made their home in the city of Columbia, Missouri, until March 7, 1911, when they separated without any apparent cause. After the separation Mrs. Fenton resided with her sister, Mrs Herring, in Columbia, at which place defendant, over Mrs. Herring's objections, called upon his wife frequently. In June, 1911, defendant's wife made a visit to relatives in the State of Oklahoma and on the Pacific Coast, returning to the home of Mrs. Herring on September 17, 1911. On the following day defendant called upon her and "requested her to shake hands with him and kiss him as a wife ought to do." Mrs. Fenton shook hands with defendant, but said that she would not be so deceitful as to kiss him. Evidently by this remark she created the impression that she did not intend to resume marital relations with defendant.

Defendant then visited a hardware store, where

he purchased a revolver; returned home; put on his best clothes; again called on his wife and shot her three times, killing her instantly.

The defense is insanity, and the only errors complained of are alleged improper remarks of the prosecuting attorney in his closing argument to the jury.

The evidence shows that defendant's mother became insane in the year 1866, following a severe attack of fever; that she was confined in the Fulton insane asylum for nearly a month and then discharged as cured. There is slight evidence that her mind was not right for some years after she was released from the asylum. Defendant was born about fourteen months after his mother was discharged from the asylum.

Insanity.

According to the evidence of defendant's witnesses he seemed to have been greatly depressed in spirits after his wife left him—was continually referring to her and requesting his friends to intercede for him and persuade her to return to his home. He would not tell anyone why his wife left him and spoke of her in kindly terms, except on one occasion when she refused to sign a deed for some property he had sold. He finally placed his children with relatives and friends with the avowed intention of traveling. Yet he did not leave home.

Mrs. Sherman, who resided just across the street from defendant, testified that defendant often visited her and her husband; was frequently lamenting the fact that his wife had left him, and expressed the view that she would have been willing to remain with him if others had not interfered. Mrs. Sherman and her husband tried to cheer defendant, but he usually seemed to be discouraged. Sold his furniture, and wanted other parties to take his children, but regretted to separate them. Wanted to travel and get away from his troubles. Took up a wooden sidewalk in front of his property and put in a brick sidewalk.

Then a week or so later tore up the brick sidewalk and put in a granitoid sidewalk. Seemed nervous and would sit with his head resting upon his hands. Sometimes he would seem all right and sometimes he appeared to be crazy. He appeared very greatly attached to his children and provided for them quite well.

A nephew of defendant testified that defendant applied to him for work. That after securing a job defendant worked about an hour and then quit, saying: "God, I can't work."

Defendant's sixteen year old daughter testified that her father did not enjoy life after his wife left him. Could not sleep well. Wanted to brood over his troubles. Frequently cried and talked about suicide.

Witness Chambers saw defendant a few hours before the latter killed his wife. Spoke to defendant, but received no reply.

After killing his wife defendant went to the residence of a Mrs. Hill, a next-door neighbor, and told her to be good to his children, that he had killed his wife and had nothing to live for. At her request he gave her his pistol and cartridges.

Witness Edwards visited the jail on the day of the killing and said to defendant: "George, how did it happen?" to which defendant replied: "I cannot tell you now. I have been putting it off six months," or "six weeks," witness could not remember which.

One of defendant's brothers came to the jail, crying, and said: "My God, why did you do this?" To his remark, defendant replied: "Why, can't you stand it better than that? It is done and we will have to stand it the best we can." Defendant seemed to be in a cool state of mind a few hours after the killing.

Sometimes defendant was sociable with his friends, and at other times would pass them without speaking and look wild out of his eyes. At another time he said his troubles were greater than he could

bear, and hinted suicide. There were more than a dozen witnesses who gave testimony similar to the foregoing, detailing peculiar or slightly peculiar conduct on the part of defendant.

Three physicians who had made a specialty of insanity and nervous diseases visited defendant after the homicide, and, from their interview with, and an examination of, the defendant, and from hypothetical questions propounded, gave it as their opinion that he was insane when he killed his wife.

On the part of the State there were more than a dozen of defendant's acquaintances who testified that they had met him, conversed with him, and observed his conduct at various dates during the last few months before the homicide, but saw nothing in his conversation or demeanor to indicate that he was insane. From their evidence it appears that defendant was a successful business man and had accumulated considerable property. He had been a farmer up to about three years before he killed his wife, and after selling his farm and moving to town had engaged in buying and selling real estate and loaning money.

There was some evidence that long before defendant's wife left him he was at times despondent or uncommunicative. He was employed as a gate-keeper by the Boone County Fair Association for a period of several days during the summer of 1911, and superintended the construction of a dwelling house for another party up to within a week or ten days before the tragedy occurred. After defendant was placed in jail for killing his wife he notified some of his debtors to call at the jail and pay what they owed him. He gave some personal checks to his attorneys for their services in defending him, and also sold and indorsed notes to a bank after he had killed his wife and been placed in jail. No effort was ever made to place him under guardianship as a person unfit to manage his own affairs.

There being substantial evidence tending to prove that defendant was insane at the time he killed his wife, and also other substantial evidence
<span style="margin">Conflict in Testimony: Insanity.</span> tending to establish his sanity at the time of that unfortunate occurrence, the issue of insanity was properly submitted to the jury and with their verdict we cannot interfere, unless we find that defendant was prejudiced by the alleged improper remarks of the prosecutor.

During the closing argument the following oc-
<span style="margin">Remarks of Prosecuting Attorney.</span> curred. "Mr. Anderson, for the State, said:

"Recall that celebrated case in New York City, a few years ago, where the defense was insanity. Recall that case in St. Louis, too, where a man shot his wife and child under similar circumstances.

"By Mr. Cullen: We object to that as outside the evidence and improper—any reference to independent acts or crimes—and we ask that the court reprimand the counsel.

"By Mr. Anderson: I am not calling any names.

"By the Court: Yes, confine yourself to the record, Mr. Anderson.

"By Mr. Anderson: Very well. I beg pardon of the court and the jury and the counsel, as well.

"And to the action of the court in failing to sufficiently rebuke the counsel for the State, the defendant, by his counsel, then and there at the time duly excepted and saved his exceptions."

Near the close of his argument Mr. Anderson, for the State, said:

"Now gentlemen, I am not appealing to your passions. You have lifted your right hand toward Heaven to bring in a verdict according to the law and the evidence and I trust you are going to do it. They have been paving the way all along to get you to send that defendant to the asylum. What does that mean? That means you had just as well say that the man was in-

sane when he committed the offense, but he is sane now. To send him to the hospital is to acquit him. They paved the way by that eminent alienist to get him out, since his incarceration. He has rested. His condition is so much better than when he went to the jail. Can a man rest in jail with the charge of murder staring him in the face? He is sane now and he was sane at the time. It is true that he sat there apparently not comprehending a thing that has gone on here. Gentlemen, do you think that those eminent specialists, do you think that those eminent attorneys, could not sufficiently drill that man, until he could pose like that? Can you do it?

"By Mr. Cullen: We object to that seriously, It is not true and we ask the court to reprimand the counsel.

"By the Court: Keep yourself within the record, Mr. Anderson.

"By Mr. Cullen: I ask the Court to reprimand the counsel. I say now, on my honor, it is not true.

"By Mr. Anderson: I beg pardon.

"And to the action of the court in failing to sufficiently reprimand counsel for the State, the defendant, by his counsel, then and there at the time duly excepted and saved his exceptions."

We are convinced that the prosecutor's reference to the New York and St. Louis cases was not harmful to defendant. Prosecutor was immediately admonished by the court to drop that line of argument, and he did so and apologized to the court for his error. If the jury understood what cases the prosecuting attorney referred to, we must presume that they, being sensible men, also understood from the court's admonition and the apology of the prosecutor that they should not consider the result or facts in any other case in arriving at a verdict in this case.

The second transgression of the prosecutor like-

State v. Fenton.

wise does not furnish sufficient foundation for over-turning the verdict.

One of defendant's experts had testified that defendant's mental condition had improved since he was placed in jail; that rest most always made Illogical a patient better, and that "a man gets as Testimony. much rest in jail as in an asylum."

The prosecuting attorney had a perfect right to comment upon this testimony, and because he ridiculed it as illogical or failed to place the same construction upon it which defendant's attorneys did was not error.

The statement by the prosecutor that defendant had acted during the trial as though he did not comprehend what was going on, was an admis-Coaching sion favorable to defendant, and prosecu-Defendant. tor's insinuation that defendant might have been drilled or coached to act as though he was insane by defendant's lawyers or witnesses was simply a weak argument based on a mere conjecture, and we do not think it could have misled the jury or inflamed their minds against defendant.

We have carefully examined all the authorities cited by defendant's learned counsel and find no case where the alleged improper remarks are of the same character complained of in this case.

The remarks of the prosecuting attorney in the case of State v. McMullin, 170 Mo. 1. c. 632, are more nearly like those made in the suit at bar than in any case to which our attention has been called. In the McMullin case the prosecutor said: "The defense is trumped up by the defendant; Mrs. Henry (who was a witness for defendant) has been brought into court without a subpoena, like a cold deck, and was not subpoenaed until after the trial began, and that is the reason we are not prepared to impeach her. We did not know that she was going to be a witness." The above quoted remarks were held improper, but an admoni-

tion from the court to the prosecutor, to confine himself to the record, was held to have cured the error, and we think the same rule should apply in this case.

We do not wish to be understood as approving the class of argument complained of in this case. It is certainly not permissible to charge either a defendant or his witnesses with a crime where there is no evidence in the record indicating their guilt. Such is the doctrine announced in the case of State v. King, 174 Mo. l. c. 659, cited by defendant, but we are not aware of any law which defendant's attorneys would have violated even if they had advised defendant to deport himself during the trial as an insane person.

The trial court accorded the defendant a careful and an impartial trial, during which his rights were zealously guarded by eminent counsel. The record contains no reversible error and the judgment is therefore affirmed.

*Faris* and *Walker, JJ.,* concur.